# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0485-23

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

     Plaintiff-Respondent,

v.

A.N.B.,

     Defendant,

and

H.D.W.,

     Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF
M.D.W. and A.W., minors.

_____

     Submitted May 1, 2024 – Decided May 9, 2024

     Before Judges Firko and Vanek.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Monmouth County, Docket No. FG-13-0051-23.

Jennifer Nicole Sellitti, Public Defender, attorney for appellant (Bruce Pozu Lee, Designated Counsel, on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent (Sookie Bae-Park, Assistant Attorney General, of counsel; Julie Beth Colonna, Deputy Attorney General, on the brief).

Jennifer Nicole Sellitti, Public Defender, Law Guardian, attorney for minors (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Noel Christian Devlin, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant H.D.W. (Harry)[1] appeals from the September 26, 2023 judgment of guardianship terminating his parental rights to his son, M.D.W. (Michael), born in March 2021, and his daughter, A.W. (Ayanna), born in June 2022. After a trial, Judge Teresa Ann Kondrup-Coyle issued a sixty-eight-page written opinion finding that plaintiff Division of Child Protection and Permanency (Division) satisfied the four prongs of the best-interests-of-the-

---

[1] We identify defendant and other parties by initials and pseudonyms to protect confidential information in the record. R. 1:38-3(d)(12).

A-0485-23

child test set forth in N.J.S.A. 30:4C-15.1(a), justifying termination of Harry's parental rights. We affirm.

I.

Factual Background

Judge Kondrup-Coyle's opinion reviewed the evidence in great detail. A summary of her findings of fact will suffice here. Defendant A.N.B. (Astrid) is Michael and Ayanna's mother. Ayanna passed away after the guardianship trial, and her appeal was withdrawn. The Division first became involved with Harry and Astrid in 2016 before Ayanna was born. Harry has been diagnosed with autism and schizophrenia. Astrid suffered brain damage from a loss of oxygen at birth and was diagnosed with bipolar disorder. Both defendants received services from the Division of Developmental Disabilities (DDD) and Social Security Disability Insurance assistance. The Division placed defendants' older daughter, Abbie, who is not involved in this appeal, with Sam and Ophelia, the paternal grandparents, at birth. Sam and Ophelia later entered into a Kinship Legal Guardian (KLG) arrangement for Abbie.

Given both defendants' cognitive limitations, in December 2020, the Division asked the hospital to notify it when Astrid gave birth to Michael. The Division received a referral the day Michael was born and executed a Dodd

removal.[2]  Michael was placed with Sam and Ophelia.  Division caseworker Jennifer Healy spoke to Astrid at the hospital and had concerns about her ability to care for Michael.  Astrid testified positive for fentanyl when Michael was born and was experiencing mental health issues.

Healy met with Harry at the couple's apartment and observed it was "filthy," "bug infested," in "complete disarray and was extremely cluttered" with shoes at the door, toys, huge television sets, and gerbil cages and items everywhere.  There were cockroaches and trash throughout the kitchen and unsanitary conditions in the apartment making it unsafe for a child.  Harry and Astrid had not previously permitted any Division caseworkers to go into the apartment.

Sam and Ophelia did not want to enter a KLG arrangement with Michael because Harry and Astrid caused them "distress and ongoing aggravation" regarding the KLG-imposed visitation with Abbie.  Harry advised the Division

---

[2]  "A 'Dodd removal' refers to the emergency removal of a child without a court order, pursuant to the Dodd Act, which, as amended, is found at N.J.S.A. 9:6-8.21 to -8.82.  The Dodd Act was authored by former Senate President Frank J. 'Pat' Dodd in 1974."  N.J. Div. of Youth & Family Servs. v. N.S., 412 N.J. Super. 593, 609 n.2 (App. Div. 2010).

that he opposed Sam and Ophelia obtaining custody of Michael. No other relatives were offered for assessment.

During the protective services litigation that followed, the judge continued the Division's custody of Michael and ordered that Harry comply with services, including a psychological evaluation. The Division provided Harry with bus passes to travel to visits with Michael and to access services. Sam and Ophelia had an "open door policy" and permitted liberal, supervised visitation at their home. However, Harry complained about his relationship with them, and his visitation dwindled over time.

Division caseworker Bryant Moore arranged to transport Harry to a visit and to his psychological evaluation, but he did not comply. Moore observed Harry speaking "very rapidly, stumbling over words, and going off topic" and saying he felt "bullied by . . . everyone." The Division also provided Harry with housing resources, which he declined.

In July 2021, Harry was evaluated by Todd Traina, Psy.D. Harry denied having a learning disability, autism, or depression. Dr. Traina administered intelligence testing to Harry, the Wechsler Abbreviated Scale of Intelligence and the Million Clinical Multiaxial Inventory, which showed he was intellectually impaired and "could impede his capacity to independently parent" or learn new

A-0485-23

parenting skills. Based on Dr. Traina's recommendation, Harry was referred to Comfort Care for individual counseling, and the Division arranged for therapeutic visits through the YMCA. Later, the YMCA terminated Harry for noncompliance with visits.

In June 2022, the judge approved the Division's permanency plan of termination of Harry's parental rights followed by adoption. That month, Astrid gave birth to Ayanna. Harry was unaware Astrid was pregnant. The Division emergently removed Ayanna and initially placed her with a non-relative resource parent because Harry's paternity was questioned. After Harry submitted to a paternity test and he was confirmed to be Ayanna's biological father, she was transitioned to Sam and Ophelia's home, joining her siblings Michael and Abbie. Harry objected, but the Division explored and ruled out other relatives he suggested.

In July 2022, the Division filed for guardianship of Michael, and amended its complaint to include guardianship of Ayanna. In October 2022, following a visit at the Division's office with Ayanna, Astrid violently shook Ayanna in her car seat in the Division's vehicle because she was crying. When the caseworker tried to stop Astrid from getting in the car, she scratched him and screamed racial slurs at him. Harry began yelling at the caseworker and threatened to kill

6

him.  The Division temporarily suspended visits due to Harry's and Astrid's behavior.  Thereafter, the Division visited Harry's apartment with police assistance.

Harry was admitted to the hospital for suicidal ideations he made on Facebook.  After being discharged, he was referred for outpatient mental health treatment.  He refused to provide his therapist's name or sign a release form for the Division.  When he finally agreed to sign the release form, the records obtained by the Division indicated that Harry inconsistently attended sessions and was not regularly taking his psychotropic medication.  In February 2023, Ayanna was placed with Sam and Ophelia, who refused to enter into a KLG arrangement due to issues with Harry and Astrid, coupled with their intention to move to Florida.

In April 2023, a caseworker Jillian Lepore transported Harry to a bonding evaluation conducted by Karen Wells, Psy.D.  Dr. Wells observed Harry had difficulty engaging with Michael and Ayanna at the same time.  For example, Harry did not notice that Ayanna put a crayon in her mouth, and he struggled changing both children's diapers.  The next month, Harry reported taking psychotropic medication and seeing a psychiatrist.

The judge held a three-day trial. Harry only attended briefly the first day. The Division presented caseworkers—Moore, Healy, and Lepore—and Sam. In addition, the Division presented expert testimony from Dr. Wells. The Law Guardian agreed with the Division's plan. Harry did not present any witnesses.

Moore and Healy testified as stated above. Lepore testified that at the time of trial, Harry was engaged in therapy and medication management, but he could not provide his therapist's name and did not sign a release form to authorize Lepore to speak to his therapist about his progress. Lepore testified about her observations of Harry during Dr. Wells's bonding evaluation when he struggled to supervise the children. Lepore stated that had Harry engaged in therapeutic supervised visitation, he would have received "one-to-one guidance, that helping hand, teaching [him]" to minimize safety risks during diaper changes and addressing the need for supervision.

Dr. Wells testified as an expert in clinical and forensic psychology as it relates to bonding and parental fitness. Although competent to participate at trial, Dr. Wells found Harry "intellectually deficient." She opined that he had "moderate cognitive limitations, particularly in the area of reasoning, logical thinking and executive functioning," which were "chronic" and "lifelong." Dr.

Wells diagnosed Harry with schizoaffective disorder and stated he was non-compliant with taking medications. Based on Harry's prior evaluations by Dr. Traina and others, Dr. Wells concluded he needed "guidance and direction to assist him in his day-to-day living." Dr. Wells noted that Harry did not follow through with services implemented for him "across the board," which was "reflective of a need for a higher level of care."

Dr. Wells testified that Harry needs assistance managing money and maintaining appointments. She explained that Harry's communication skills were also impacted, he often misinterpreted a situation, and felt misunderstood. Dr. Wells opined Harry had "no awareness" that Sam and Ophelia were successfully caring for his children, but he could not. Regardless of whether he engaged in therapy, Dr. Wells concluded that Harry would not be "able to assume a parental role" because he could not manage a child's life. Dr. Wells opined Harry would be unable to safely parent in the future, and there were no services available to improve his condition.

On the issue of permanency, Dr. Wells concluded that Sam and Ophelia understood their roles in serving as the children's primary parental figures in light of Harry's cognitive limitations. Dr. Wells added that Michael and Ayanna deserved permanency with Sam and Ophelia, who have demonstrated their

9

"ability to provide continuity of care" with their sister Abbie and "to have liberal contact" with Harry.

Dr. Wells "strongly" considered KLG because Sam and Ophelia had an "open door policy" with visitation. But Dr. Wells opined that KLG was not in Michael and Ayanna's best interests because of Harry's noncompliance with services, his failure to visit the children, and the difficulties Sam and Ophelia experienced regarding Abbie's KLG arrangement. Dr. Wells concluded that adoption would provide the children with the stability they need.

Sam testified that the Division had advised him and Ophelia about the differences between KLG and adoption. Sam expressed frustration with the KLG arrangement with Abbie and felt Harry and Astrid "used KLG to bully us." Sam stated Harry and Astrid were unappreciative of his and Ophelia's care of the children and their efforts to facilitate visitation. Going forward, Sam testified he could no longer tolerate numerous "interruptions with the parents," welfare checks, and allegations he and Ophelia were not properly caring for the children, which would continue under a KLG arrangement. Sam stated that adoption would provide Michael and Ayanna with "a stable home."

## The Judge's Decision

The judge issued detailed findings with respect to each of the statutory prongs in N.J.S.A. 30:4C-15.1(a). The judge found the Division's witnesses were "credible," had an "independent recollection of the case," and that: (1) Harry's parental relationship with Michael and Ayanna endanger[ed] the children's safety, health, or development because of his mental illness, cognitive limitations, and inability to meet even the children's most basic needs; (2) Harry's behavioral issues, refusal to comply with services, failure to consistently visit the children without an ability to appraise his own situation, and acknowledge his limitations heightens the risk of harm were the children to be in his care; (3) Harry is unwilling or unable to address the risk of harm his parental relationship presents to Michael and Ayanna, despite the reasonable efforts of the Division to offer Harry services related to the causes of that risk of harm; (4) a delay in permanent placement will add to the harm the children face; and (5) termination of Harry's parental rights will not do more harm than good.

The judge emphasized that multiple service providers noted "consistent and significant concerns regarding [Harry's] mental capacity and ability to meet even the most basic needs of a child." The judge found the Division proved that

11

Harry was "unwilling and unable to remedy the unaddressed and significant mental and cognitive limitations that caused each of [the] children to be removed."

This appeal followed. Harry does not challenge the judge's finding that the children's safety, health, or development have been or will continue to be endangered by the parental relationship under prong one; or that he failed to mitigate harm under prong two; or the adequacy of services under part one of prong three; or that terminating his parental rights would not do more harm than good under prong four. Harry raises two discrete issues on appeal:

> (1) the judge's determination that the paternal grandparent, Sam, unequivocally rejected KLG is no longer adequately supported by the record because his concerns primarily involved Astrid, who has passed away; and

> (2) the judge erred in admitting Dr. Traina's findings as to what would constitute reasonable services into evidence without his testimony, thus admitting inadmissible hearsay, violating Harry's right to confront Dr. Traina, and prejudicing Harry's ability to challenge whether the Division's efforts under prong three were reasonable.

The Law Guardian seeks affirmance.

II.

With respect to Harry's appeal, our scope of review is limited. N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 605 (2007). We will uphold a trial judge's factfindings if they are "supported by adequate, substantial, and credible evidence." N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 552 (2014). "We accord deference to factfindings of the family court because it has the superior ability to gauge the credibility of the witnesses who testify before it and because it possesses special expertise in matters related to the family." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448 (2012); see Cesare v. Cesare, 154 N.J. 394, 413 (1998).

"Only when the trial court's conclusions are so 'clearly mistaken' or 'wide of the mark' should an appellate court intervene and make its own findings to ensure that there is not a denial of justice." N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008) (quoting G.L., 191 N.J. at 605). We also accord deference to the judge's credibility determinations "based upon his or her opportunity to see and hear the witnesses." N.J. Div. of Youth & Fam. Servs. v. R.L., 388 N.J. Super. 81, 88 (App. Div. 2006). No deference is given to the court's "interpretation of the law" which is reviewed de novo. D.W. v. R.W., 212 N.J. 232, 245-46 (2012).

When terminating parental rights, the court focuses on the "best interests of the child standard" and may grant a petition when the four prongs set forth in N.J.S.A. 30:4C-15.1(a) are established by clear and convincing evidence. In re Guardianship of K.H.O., 161 N.J. 337, 347-48 (1999). "The four criteria enumerated in the best interests standard are not discrete and separate; they relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." Id. at 348.

N.J.S.A. 30:4C-15.1(a) requires the Division to prove:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3) The Division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.

14

The considerations involved are especially "fact sensitive and require particularized evidence" addressing the specific circumstances present in each case. K.H.O., 161 N.J. at 348.

We first address Harry's argument that Astrid's passing constituted a substantial post-judgment change in circumstances. Harry asserts that Sam and Ophelia rejected KLG for Michael and Ayanna and seek adoption out of their concerns for Astrid, not him, as a parent. Harry now seeks a remand to determine whether Sam and Ophelia still favor adoption over KLG in light of Astrid's passing and whether termination of Harry's parental rights is still in Michael's and Ayanna's best interests.

In support of his argument, Harry relies on our decision in New Jersey Division of Youth & Family Services v. T.S., 417 N.J. Super. 228 (App. Div. 2010), where the mother's parental rights were terminated. Post-trial, the mother continued to alleviate the harms that led to the child's removal and supported her ability to achieve reunification. Id. at 246-47. Further, safety concerns arose necessitating the termination of the child's anticipated adoption placement. Ibid. We remanded to the Family Part for an additional review of "these additional facts, . . . not present at the time of trial, [but which] must nevertheless be

assessed before a conclusion can be drawn that termination will do more harm than good." Id. at 249.

We concluded in T.S. that "[i]t is unusual to have such a culmination of events, which when taken together, call into question whether the possible detriment posed by keeping the parent-child relationship intact is outweighed by the potential benefits of terminating [the mother's] parental rights." Ibid. Unlike T.S. however, there has been no change in Harry's ability or willingness to be "up to the task" of parenting.

Harry has never provided a safe and stable home for Michael and Ayanna. Moreover, Harry has never had custody of these children. Instead, the unrefuted evidence showed that Harry "require[s] extensive and lifelong support to provide for [his] own needs" and "[n]o service, support, intervention, or program could alter [his] limitations" and render him a capable parent. Harry's attempt to draw parallels between T.S. with the facts at hand warranting a remand is unsupported by the evidence. There are no current new facts presented by Harry to warrant a remand to reexamine the record. T.S. is simply not on point here.

We are satisfied that Astrid's passing does not warrant a reevaluation of the third prong. The caseworker testified that Sam and Ophelia are "very adamant" about adopting Michael and Ayanna instead of entering a KLG

arrangement as they did with Abbie. Sam unequivocally testified that he and Ophelia want to adopt Michael and Ayanna and not pursue KLG. Sam testified that Astrid <u>and</u> Harry "use[d] KLG to bully [him and Ophelia]. And that's what they've done in the past. And I don't want to be bullied anymore. It just doesn't work for us." Sam elaborated on his reason to adopt:

> Because [Michael and Ayanna] need to be loved and they need a stable home. They need to recognize who their family is . . . . [T]hey're much better off with us. We're more . . . established . . . . [W]e have five other children. We have a total of [thirteen] grand[children]—and that's including [Abbie]. The parents are—from my opinion, just not up . . . for the task.

Contrary to Harry's assertion, Sam (and Ophelia) did not limit their concerns to Astrid only but clearly expressed their preference for adoption over KLG because of reprehensible behavior exhibited by both Harry and Astrid. Therefore, Astrid's passing does not constitute a changed circumstance. Moreover, Harry has a history of becoming agitated and making threats concerning the use of a gun. Sam testified that he had to set limits with visitation because Harry and Astrid "both lash out," and Harry would show up very late in the evening for visitation. We discern no basis for a remand to reevaluate prong three.

17

### III.

We next address Harry's final contention that the judge's reliance on inadmissible hearsay by admitting Dr. Traina's evaluation without having him testify was prejudicial and constituted reversible plain error. At trial, the Division proffered Dr. Traina's evaluation only as to his recommendation on reasonable services for Harry. Over objection by Harry's counsel, the judge ruled the evaluation was admissible for the limited purpose of establishing what recommendations Dr. Traina made in order to show the referrals the Division made and services it offered relative to prong three. The judge elaborated that Dr. Traina's recommendations would be considered to show that the Division provided services, not for the truth asserted.

We "apply a deferential standard of review to the trial court's evidentiary rulings." State v. Hyman, 451 N.J. Super. 429, 441 (App. Div. 2017). "The necessity for, or propriety of, the admission of expert testimony, and the competence of such testimony, are judgments within the discretion of the trial court." State v. Zola, 112 N.J. 384, 414 (1988). "[T]he admission or exclusion of evidence is within the discretion of the trial court." State v. Torres, 183 N.J. 554, 567 (2005).

Hearsay is an out-of-court statement offered for the truth of the matter it asserts. State v. Gore, 205 N.J. 363, 375 (2011) ("[o]ur hearsay rules of evidence clearly provide that 'a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted' is inadmissible unless encompassed by one of the stated exceptions to the rule precluding hearsay testimony" (citation omitted)). Hearsay is not admissible under N.J.R.E. 802, subject to exceptions as outlined in N.J.R.E. 803-804, and when the Confrontation Clause is implicated, as discussed in Crawford v. Washington, 541 U.S. 36 (2004).

"However, hearsay is not admissible substantively as establishing the truth of the statement." State v. Vandeweaghe, 351 N.J. Super. 467, 480 (App. Div. 2002), aff'd and remanded, 177 N.J. 229 (2003). In Vandeweaghe, we found prejudicial an expert witness' testimony that consisted of extensive hearsay regarding the defendant's life, habits, and history. 351 N.J. Super. at 478-79, 483-84. The expert's "recitation of hearsay" denied the defendant his confrontation rights. Id. at 483.

Unlike in Vandeweaghe, Judge Kondrup-Coyle did not consider Dr. Traina's psychological findings for the truth of the matter asserted and did not recite hearsay to terminate Harry's parental rights. Rather, the judge only

considered the evaluation for the limited purpose the Division made reasonable efforts to provide services to Harry under prong three. Because the judge did not rely on actual hearsay, the judge properly admitted Dr. Traina's evaluation and there was no prejudice.

Further, Dr. Traina's evaluation was admissible under <u>Rule</u> 5:12-4(d), which states: "The Division . . . shall be permitted to submit into evidence, pursuant to N.J.R.E. 803(c)(6) and 801(d), reports by staff personnel or professional consultants. Conclusions drawn from the facts stated therein shall be treated as prima facie evidence, subject to rebuttal."

Dr. Traina qualifies as a professional consultant and his evaluation was admissible under <u>Rule</u> 5:12-4(d). In his reply brief, Harry avers that even if <u>Rule</u> 5:12-4(d) is applicable, Dr. Traina's evaluation should still be barred because the evaluation is not trustworthy. Harry claims the evaluation is not trustworthy because Dr. Traina concluded that Harry has cognitive limitations, with an IQ of 60, but Harry was deprived of an opportunity to counter whether any of his medications and mental health disorders artificially lowered his IQ.

However, as stated, Dr. Traina's opinion and diagnoses were not considered by the judge and not admitted into evidence. Moreover, counsel did

not raise an objection based on Confrontation Clause grounds, and therefore waived the right to make that claim on appeal.

The right to confrontation may be waived for failure to object to the offending evidence. Melendez-Diaz v. Massachusetts, 557 U.S. 305, 313 n.3 (2009); accord State v. Williams, 219 N.J. 89, 98 (2014). The defendant must raise his or her Confrontation Clause objections. Melendez-Diaz, 557 U.S. at 327; accord Williams, 219 N.J. at 99. Here, in short, Harry failed to raise or preserve his Confrontation Clause claim. That claim is waived.

We therefore affirm the September 26, 2023 judgment of guardianship substantially for the reasons stated in Judge Kondrup-Coyle's comprehensive opinion. Harry's additional arguments are without sufficient merit to warrant further discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0485-23